UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

**DEXTER WAITERS**,

                    Petitioner,                      **MEMORANDUM
DECISION AND ORDER**

           -against-                            10-cr-00087 (AMD)

**UNITED STATES OF AMERICA**,

                    Respondent.

------------------------------------------------------------X

**ANN M. DONNELLY**, United States District Judge:

       The *pro se* petitioner, Dexter Waiters, petitions for a writ of habeas corpus pursuant to 28

U.S.C. § 2255.  (ECF No. 198.)  On December 21, 2012, a jury convicted the petitioner of

racketeering, racketeering conspiracy, murder in aid of racketeering, conspiracy to commit

murder in aid of racketeering, unlawful use and discharge of a firearm, being a felon in

possession of a firearm, possession of body armor after being convicted of an offense that

constitutes a crime of violence, and conspiracy to distribute cocaine and cocaine base.[1]  (ECF

No. 195.)  The Honorable Sandra L. Townes sentenced the petitioner to life imprisonment on

each of the three top counts of the indictment—racketeering, racketeering conspiracy and murder

in aid of racketeering—with lesser sentences on the remaining counts.[2]  (*Id.* at 3.)  The Second

Circuit affirmed his conviction on November 19, 2007, *United States v. Sebbern*, 641 F. App'x

---

[1]  The jury acquitted the petitioner of using a firearm in connection with the drug trafficking conspiracy.
  (ECF Nos. 133-34.)

[2]  The case was reassigned to me on February 21, 2018.

18 (2d Cir. 2015) (summary order), and the Supreme Court denied a timely petition for writ of certiorari on October 3, 2016, *Sebbern v. United States*, 137 S. Ct. 280 (mem.).[3]

The petitioner asserts six grounds for habeas relief: (1) the jury charge and verdict form were inconsistent; (2) the prosecutor suborned perjured testimony; (3) the Court admitted hearsay testimony in violation of the Confrontation Clause; (4) the prosecutor had impermissible contact with a juror; (5) the petitioner's sentence was unconstitutional; and (6) his trial and appellate lawyers were ineffective.[4]  (ECF No. 198.)  The Government opposes.  (ECF No. 210.) For the reasons that follow, the petition is denied.

## BACKGROUND

### I.    Overview[5]

The petitioner joined the Gorilla Bloods, a subset of the national Bloods street gang, while he was serving a state prison sentence.  When he was released in May of 2008, he returned to Port Richmond, Staten Island, and began initiating members into the gang.  The petitioner and his associates sold cocaine and crack from the petitioner's house.

On November 7, 2009, the petitioner and Dontae Sebbern shot and killed Jermaine Dickersen, a high-ranking member of a different subset of Bloods based in the Arlington neighborhood of Staten Island.  Police arrested the petitioner and Sebbern as they fled from the murder scene in a car riddled with bullet holes; both were wearing military-grade bullet-proof vests and the petitioner had the murder weapon, a 9 mm pistol.

---

[3]  Dontae Sebbern was the petitioner's co-defendant.  His petition for a writ of habeas corpus is addressed in a separate opinion.

[4]  The petitioner included a seventh ground generically labeled "unconstitutional jury instruction."  (ECF No. 198 at 9.)  I interpret that ground as cumulative of ground one, and discuss it in that section.

[5]  Because the petitioner was convicted, I summarize the facts in the light most favorable to the verdict. *Garbutt v. Conway*, 668 F.3d 79, 80 (2d Cir. 2012).

## II.   The Trial

The petitioner and Sebbern went to trial before Judge Townes and a jury in December of 2012.  (ECF Nos. 128-132, 147-150.)  Before jury selection, the Government moved without objection to change the numbering of racketeering acts three and four to racketeering acts three A and three B.  (Tr. at 8-10.)  The Court accepted the renumbering, and the parties adopted the change throughout the trial.

The Government's evidence at trial included the testimony of nine civilian witnesses, including three former Bloods, multiple state and federal law enforcement officers, experts in ballistics and DNA, and a medical examiner.  The Government also introduced inculpatory letters the petitioner wrote while he was held in the Metropolitan Detention Center in Brooklyn.[6] The evidence established the following facts.

While he was serving a state prison sentence, the petitioner joined the Gorilla Bloods gang, a Bloods "set" within the "Stone Nation" faction of the national Bloods street gang.  By the time of his release in 2008, the petitioner had become a high-ranking member of the gang, and inducted others from his Port Richmond neighborhood, including Sebbern, Earl Mangen, Anthony Johnson, Elvis Byrd and Aaron Thomas.  (Tr. at 809-13, 888-90.)  Over the next two years, the gang sold crack cocaine from the petitioner's house.[7]  (*Id.* at 888-897, 1192-93, 1754-58.)

---

[6]  The defense did not present any evidence.

[7]  Lamar Chase and Ramone Vaughn, former Bloods members, testified that the petitioner also sold crack cocaine in 2004 and 2005, at a time when the petitioner was actually incarcerated.  Counsel for the petitioner moved for a mistrial, which the Court denied.  (Tr. at 2247-66.)  The parties ultimately stipulated that the petitioner was not selling narcotics from February 14, 2004 through 2005.  (*Id.* at 2268.)

On November 6, 2009, the petitioner hosted two high-ranking members of the Gorilla bloods—Tyreen Harley, a "GF" or "godfather"[8] from Brooklyn, and Joshua Demellier from upstate New York. (*Id.* at 913-16.) Later that night, they went to a party at an unlicensed social club in the Arlington neighborhood of Staten Island. (*Id*. at 1493-95, 1504.) Members from the "Nine Trey Bloods," a different faction, also attended the party, including Jermaine Dickersen, a high-ranking member. (*Id.* at 1318-19, 1506-08.) At one point during the party, Dickersen and other members of the Nine Trey Bloods went to the back of the club to smoke marijuana; the Gorilla Bloods group, including the petitioner, Harley and Demellier, came to the back area shortly after. (*Id.* at 1512-13.) Mangen, a Gorilla Blood, introduced Harley to the Nine Trey Bloods as the "Big Homey," a high-ranking member of the Gorilla Bloods. (*Id.*) After exchanging Bloods handshakes, Dickersen "G-checked" Harley—asking him how he obtained his rank, who initiated him and other facts about his membership to see if he was "official." (*Id.* at 1516-19.) Harley answered the questions, but in a cocky and aggressive way. (*Id.* at 1520.) Harley returned to the party, but Dickersen was skeptical about his claimed rank within the Bloods. (*Id.* at 1522-23.)

About an hour later, Harley became angry and aggressive with a woman who spurned his advances. He cursed at her as she walked away, and bumped into Elome Guinn, a member of the Nine Trey Bloods, causing Guinn to spill his drink. (*Id.* at 1531-33.) They argued, and Harley punched Guinn in the face. (*Id.* at 1536.) Guinn and other Nine Trey Bloods attacked Harley. (*Id.* at 1536-37.) The petitioner and other Gorilla Bloods tried to intervene, but Dickersen held them off. (*Id.* at 1537-38.)

---

[8] The godfather is at the top of the Gorilla Bloods hierarchy, followed by the "high OG," the "low OG," five-star generals, four-star generals, and so on down to one-star generals, with soldiers at the bottom. (Tr. at 815, 826.)

A second fight broke out when Demellier sucker punched Dion Nelson, a member of Dickersen's group.  (*Id.*)  Nelson and others punched Demellier, who pulled out a gravity knife to defend himself.  (*Id.* at 1540-41.)  Nelson then shot Demellier, and the crowd fled the club. (*Id.* at 1542.)  Once outside, Harley berated the petitioner and the other Gorilla Bloods for not coming to his aid.  (*Id.* at 1547-49.)

After the party broke up, Dickersen and others went to the nearby Holland Houses, and then decided to get breakfast.  (*Id.* at 536-40.)  As they waited for a car, the petitioner and Sebbern, both wearing dark clothing and hoods, approached from the parking lot.  They opened fire and killed Dickersen.  (*Id.* at 541, 1579-80.)

Police officers from the 120th precinct were at the social club and responded to the call for shots fired.  (*Id.* at 621.)  As they approached the parking lot, a black Mercedes "took off quickly, ran the stop sign at Holland and Benjamin, almost striking" one of the police cars.  (*Id.* at 704-05, 576-78.)  The officers turned on their lights and tried to stop the Mercedes, which turned back into the parking lot.  (*Id.* at 578.)  The car stopped for a moment and Sebbern jumped out of the passenger side and ran towards the Holland Houses.  (*Id.* at 578-79.)  Officers Pena and Aguillo chased Sebbern, who tripped and fell, dropping a revolver.  (*Id.* at 626-27, 1102-04.)  The officers handcuffed Sebbern, secured the revolver and patted him down for other weapons.  (*Id.* at 627.)

Meanwhile, as the driver fled from the Mercedes with an officer in pursuit, the petitioner fell from the rear drivers' side, and dropped a 9 mm handgun.  (*Id.* at 668-69.)  Officers tackled and handcuffed him.  (*Id.* at 668-71.)  Both the petitioner and Sebbern were wearing camouflage military-grade bulletproof vests; the petitioner was barefoot.  (*Id.* at 581, 670-71.)

5

Dickersen was pronounced dead at the hospital.  (*Id.* at 777.)  The medical examiner who performed the autopsy removed a bullet from Dickersen's body; the NYPD ballistics lab matched the bullet to the petitioner's gun.  (*Id.* at 781-85, 1926-29.)  The police recovered a pair of sneakers with the petitioner's DNA.  (*Id.* at 1272-74.)[9]

While the petitioner was detained at the MDC, corrections officials seized two draft letters from his cell, in which he wrote the following:

> You already known loyalty is royalty and I live by this slogan 2 the upmost.  I feel like this bro if you should oppress a rilla you should be delt wit no matter who you are and dats basically wut this is about.
>
> you know I had 2 let my knuckles drag on a few dirty monkeys who felt that they can disrespect Bee Es Duble Gee [Black Stone Gorilla Gangsters].

(*See* ECF No. 97 at 12 (quoting ECF Nos. 97-5, 97-6).)

At one point during the trial, one of the AUSAs alerted the courtroom security officers in the courthouse lobby to a "fight out on the street that may be related to a trial in the courthouse." (*Id.* at 1089.)  The prosecutor then noticed that juror six was also in the lobby on the other side of the security checkpoint barrier.  (*Id.*)  The prosecutor did not identify a specific case, and did not think that juror overhead him; nevertheless, he told the defense and the court what happened. (*Id.* at 1089-90.)  The parties and the Court agreed that there was no need to take any action.  (*Id.* at 1090.)

## III.    Jury Charge, Verdict and Sentencing

In her charge, Judge Townes described each racketeering act, including acts three A and three B.  (*Id.* at 2499, 2507-12.)  The verdict form identified the racketeering acts in the same way.  (ECF No. 133.)

---

[9]  Police found one of the sneakers in the Mercedes and the other in the parking lot.

On December 21, 2012, the jury convicted the petitioner of racketeering, racketeering conspiracy, murder in aid of racketeering, conspiracy to commit murder in aid of racketeering, unlawful use and discharge of a firearm, being a felon in possession of a firearm, possession of body armor after being convicted of an offense that constitutes a crime of violence, and conspiracy to distribute cocaine and cocaine base.  (ECF No. 195; Tr. at 2616-44.)  Judge Townes sentenced the petitioner to life imprisonment on each of the three top counts of the indictment—racketeering, racketeering conspiracy and murder in aid of racketeering—with lesser sentences on the remaining counts.  (ECF No. 195 at 3.)

IV.   **Second Circuit Appeal**

The petitioner, represented by counsel, appealed his conviction to the Second Circuit Court of Appeals, arguing that the evidence was insufficient to establish his guilt of murder and conspiracy to murder Dickerson, conspiracy to distribute narcotics and the use of a firearm in furtherance of those crimes.  *See United States v. Sebbern*, 641 F. App'x 18, 21 (2d Cir. 2015) (summary order).  The Second Circuit affirmed the conviction, holding that "a rational juror could have found that defendants planned to murder Dickersen, and that they did in fact murder him, in order to placate or impress Harley, a high-ranking member of their gang who had recently rebuked defendants for failing to oppose Dickersen at the party."  *Id.* at 20-21.  The Second Circuit found the evidence on the other counts was also sufficient.

## DISCUSSION

28 U.S.C. § 2255 permits a "prisoner in custody under sentence of a court" to "move the court which imposed the sentence to vacate, set aside or correct the sentence" on the "ground that the sentence was imposed in violation of the Constitution or laws of the United States."  28 U.S.C. § 2255(a).  The Court "shall vacate and set the judgment aside" if the Court finds that

"there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack." *Id.* § 2255(b).  In ruling on a Section 2255 motion, the Court construes a *pro se* petitioner's submissions liberally and interprets them "to raise the strongest arguments that they suggest." *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009) (citations omitted).

"In general, a defendant is barred from collaterally challenging a conviction under § 2255 on a ground that he failed to raise on direct appeal." *United States v. Thorn*, 659 F.3d 227, 231 (2d Cir. 2011) (citations omitted); *see also Marone v. United States*, 10 F.3d 65, 67 (2d Cir. 1993) ("A § 2255 petition may not be used as a substitute for direct appeal.") (citations omitted). "An exception applies, however, if the defendant establishes (1) cause for the procedural default and ensuing prejudice or (2) actual innocence." *Thorn*, 659 F.3d at 231 (citations omitted).

While "[n]egligence on the part of a prisoner's postconviction attorney does not qualify as 'cause,'" *Maples v. Thomas*, 565 U.S. 266, 280 (2012) (citation omitted), "[i]neffective assistance of appellate counsel may constitute cause for a procedural default," *Xiang v. United States*, No. 09-CV-7579, 2010 WL 3155052, at *4 (S.D.N.Y. Aug. 6, 2010) (citing *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000)).  To establish appellate counsel's ineffectiveness, the petitioner must show "first, that appellate counsel committed errors so serious as to be objectively unreasonable and, second, that the result of the proceeding would likely have been different in the absence of counsel's errors." *Id.* (citing *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984) (citation omitted)).  The petitioner must establish that he suffered "actual prejudice resulting from the errors of which he complains;" not the "*possibility* of prejudice," but that the errors "worked to his *actual* and substantial disadvantage." *United States v. Frady*, 456 U.S. 152, 168-70 (1982).  In the alternative, the petitioner may avoid procedural default if he can

show that he is actually innocent.  *Thorn*, 659 F.3d at 231.  "To establish actual innocence, petitioner must demonstrate that, 'in light of all the evidence,' it is more likely than not that no reasonable juror would have convicted him."  *Bousley v. United States*, 523 U.S. 614, 623 (1998) (quoting *Schlup v. Delo*, 513 U.S. 298, 327-28 (1995) (citation omitted)).

The petitioner asserts six grounds for habeas relief, none of which he raised on direct appeal: (1) the jury charge and verdict form were inconsistent; (2) the prosecutor introduced perjured testimony; (3) the Court admitted hearsay testimony in violation of the Confrontation Clause; (4) the prosecutor had unauthorized contact with a juror; (5) his sentence was unconstitutional; and (6) his trial and appellate counsel were ineffective.  Except for the ineffective assistance of counsel claims, which "may be brought in a collateral proceeding under [Section] 2255, whether or not the petitioner could have raised [them] on direct appeal," *Massaro v. United States*, 538 U.S. 500, 504 (2003), the petitioner is barred from challenging the other claims collaterally unless he can establish cause and prejudice, or that he is actually innocent.

The petitioner blames his appellate lawyer for failing to raise the procedurally defaulted claims.  (ECF No. 198.)  Accordingly, I consider the petitioner's sixth ground for relief first: that his appellate counsel was ineffective.

a.  *Ineffective Assistance of Appellate Counsel*

The *Strickland* standard applies to claims of ineffective assistance of appellate counsel. *See Claudio v. Scully*, 982 F.2d 798, 803 (2d Cir. 1992) ("Although *Strickland* addressed the constitutional standard for ineffective assistance of counsel in the trial counsel context, our Circuit has also adopted the *Strickland* two-prong test in assessing the effectiveness of appellate counsel.") (citation omitted).  Accordingly, the petitioner must show that (1) his attorney's

performance was deficient, and (2) that this deficiency caused him prejudice.  *Strickland*, 466 U.S. at 694.

"As in all ineffective assistance of counsel claims, the movant must overcome a strong presumption that counsel exercised reasonable professional judgment: 'Appellate counsel does not have a duty to raise all colorable claims on appeal; rather, counsel should use reasonable discretion to determine which claims constitute a defendant's best arguments for obtaining a reversal of a conviction.'"  *Figueroa v. United States*, No. 17-CV-9505, 2019 WL 6338420, at *3 (S.D.N.Y. Nov. 26, 2019) (quoting *Forte v. LaClair*, 354 F. App'x 567, 569 (2d Cir. 2009)). An appellate attorney is ineffective for failing to raise a claim only if the petitioner shows that "counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker."  *Forte*, 354 F. App'x at 569 (quoting *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994)).

According to the petitioner, his appellate lawyer failed to "raise meritorious issues on appeal."  (ECF No. 198-1 at 6.)  Since he does not identify these issues, I interpret them to be the grounds he raises in his petition: that the jury charge and verdict form were inconsistent, that the prosecution suborned perjury and introduced hearsay testimony, and that a prosecutor had improper contact with a juror.  The petitioner cannot establish that these were "significant and obvious issues" for appeal, because as explained below, these claims have no merit, and appellate counsel reasonably focused on issues that had a better chance of success—a decision a court should not second guess.  *See Lugo v. Kuhlmann*, 68 F. Supp. 2d 347, 372 (S.D.N.Y. 1999) ("[R]eviewing courts should not second guess the reasonable professional judgments of appellate counsel as to the most promising appeal issues.") (citations omitted).

Because the petitioner cannot establish that these issues were "significant and obvious," his ineffective assistance of counsel claim fails on the merits, and does not establish cause for the procedural default of his remaining claims.

b.   *Ineffective Assistance of Trial Counsel*

As discussed above, the petitioner is not procedurally foreclosed from raising an ineffective assistance of trial counsel claim. *See generally Massaro*, 538 U.S. at 504 ("We hold that an ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under [Section] 2255, whether or not the petitioner could have raised the claim on direct appeal."). The claim is meritless in any event.

 To establish that his trial lawyer was ineffective, a petitioner must show (1) that his counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. 668, 687 (1984). The petitioner faults his trial lawyer for "allow[ing] Petitioner to be sentenced . . . on charges [for] which there was no basis" and for "fail[ing] to render effective assistance of counsel by failing to challenge and preserve issues during trial." (ECF Nos. 198 at 8, 198-1 at 6.) The petitioner does not identify the issues that trial counsel failed to challenge or preserve. In fact, trial counsel raised objections to much of what the petitioner now challenges. For example, trial counsel objected to the witnesses' testimony that the petitioner sold crack cocaine in 2004 and 2005, and moved for a mistrial:

> The United States government has the obligation to make sure that the testimony that comes out of their witness' mouths is accurate, honest and without mistake. They know that. Mr. Ariail knows that. He knew since yesterday morning that the testimony of Mr. Chase and Mr. Vaughn about 2004 and 2005 could not be accurate, was either a mistake or a lie . . . I think, Your Honor, the only appropriate remedy would be a mistrial.

(Tr. at 2262-63.) Although the Court denied the mistrial, counsel secured the Government's stipulation that the petitioner did not make any sales of narcotics from February 14, 2004,

11

through 2005. (*Id.* at 2267-68.) Trial counsel also objected to Chase's testimony on hearsay grounds, which required the Government to defend its admissibility at a sidebar conference and in written submissions. (*Id.* at 848-76; ECF Nos. 118, 119.) While counsel did not object to the renumbering of the indictment or to the prosecutor's brief contact with a juror, there was no basis to do so; "the failure to make a meritless argument does not rise to the level of ineffective assistance." *United States v. Kirsh*, 54 F.3d 1062, 1071 (2d Cir. 1995).

I also reject the petitioner's general complaint that his trial lawyer "allowed [him] to be sentenced . . . on charges [for] which there was no basis." (ECF No. 198 at 8.) On the contrary, the petitioner was convicted not because of some shortcoming on his lawyer's part, but because of the strength of the evidence against him, including his swift apprehension shortly after the shooting, while he possessed the murder weapon, and the letters in which he opined that anyone who "oppressed" a gang member "should be delt [sic] with." (ECF Nos. 97-5, 97-6.) The jury weighed all of the evidence and the witness' credibility and convicted the petitioner. The Second Circuit affirmed the conviction, determining that the evidence was sufficient. *See Sebbern*, 641 F. App'x at 18.

c. *Remaining Claims*

As explained above, the remaining claims are barred because they were not raised on direct appeal, and the petitioner has not shown cause and prejudice that would excuse the procedural default. In any event, none of the remaining claims have merit.

i. *The Jury Charge and Verdict Form*

The petitioner objects to the change in the way that two of the racketeering acts were identified during the trial; he claims that because the order in the superseding indictment was different, there is an unconstitutional inconsistency. (*See* ECF No. 198-1 at 2 ("The renumbered

counts and Racketeering Acts 3 and 4 do not coincide with the 4th superseding indictment
Waiters stood trial on, the Court's jury charge, the jury's findings, or the jury's oral
pronouncement of verdict.  There is no way to ascertain which charges the jury actually found
Waiters guilty of, or decipher the confusion that has resulted.").)

In fact, the racketeering acts were renumbered before the jurors were even selected, and
were identified in the same way throughout the trial, in Judge Towne's final charge and on the
verdict form.  (Tr. at 8-10.)  The prosecutor explained in summation that "[t]he third racketeering
act charged in count one is actually broken into two parts; the conspiracy to murder [Jermaine
Dickerson] and the second part is the completed murder of [Jermaine Dickersen]."  (*Id.* at 2288.)
Judge Townes said the same thing in her final charge: "The third Racketeering Act charges both
defendants with two acts; A, murder and, B, conspiracy to murder."  (Tr. at 2499.)  Finally, the
acts were identified that way on the verdict form.  (ECF No. 133.)  The ordering and numbering
of the racketeering acts were consistent, and there was no possibility of juror confusion.

Interpreting the petition to raise the strongest arguments it suggests, I also consider
whether Judge Townes amended the indictment in violation of the Fifth Amendment.  It is a
"settled rule in the federal courts that an indictment may not be amended except by resubmission
to the grand jury, unless the change is merely a matter of form."  *Russel v. United States*, 369
U.S. 749, 770 (1962) (citing *Ex Parte Bain*, 121 U.S. 1 (1887), *United States v. Norris*, 281 U.S.
619 (1930) and *Stirone v. United States*, 361 U.S. 212, 215-16 (1960)) ("Ever since *Ex parte
Bain* was decided in 1887, it has been the rule that after an indictment has been returned its
charges may not be broadened through amendment except by the grand jury itself.").  "An
indictment has been constructively amended when the trial evidence or the jury charge operates
to broaden the possible bases for conviction from that which appeared in the indictment."  *United*

*States v. Rigas*, 490 F.3d 208, 225 (2d Cir. 2007) (alterations, quotation marks and citations omitted).  Judge Townes did not amend the indictment; she merely consolidated two related racketeering acts into sub-acts.  This change was purely a matter of form, and did not broaden the possible bases for convicting the petitioner of racketeering.

Finally, the petitioner claims that Judge Townes' final charge required the jury to find him "guilty of alternate charges," "vitiated the burden of proof" and "focused more on guilt than innocence," but does not specify how.  (ECF No. 198-1 at 7.)  I have reviewed Judge Townes' charge, and there was no error.  Judge Townes accurately defined the burden of proof, explaining that the government had "the burden of proving guilt beyond a reasonable doubt with respect to each element of each crime that each defendant is charged with committing."  (Tr. at 2456.)  Judge Townes also instructed the jurors to consider the counts against the petitioner separately, and not to allow a "verdict as to any one count of the indictment [to] determine [the] verdict as to any other count."  (Tr. at 2474.)  In other words, there was nothing improper about the charge.

ii.  *Perjured Testimony*

The petitioner claims that the prosecutors knowingly elicited false testimony from Lamar Chase and Ramone Vaughn, who testified that the petitioner sold drugs in 2004 and 2005, at a time when the petitioner was incarcerated.  (ECF No. 198-1.)  "[A] showing of perjury at trial does not in itself establish a violation of due process warranting habeas relief."  *Ortega v. Duncan*, 333 F.3d 102, 108 (2d Cir. 2003) (citation omitted).  A conviction will be set aside if the habeas petitioner proves that: "(1) false testimony was introduced; (2) the prosecutor knew or should have known that the testimony was false; (3) the false testimony went uncorrected; and (4) there was a reasonable likelihood that the false testimony could have affected the judgment of

14

the jury." *Calderon v. Keane*, 115 F. App'x 455, 457 (2d Cir. 2004) (summary order) (citing *Shih Wei Su v. Filion*, 335 F.3d 119, 127 (2d Cir. 2003)).

The record does not establish that the prosecutors knew or should have known that Chase and Vaughn were testifying falsely.  The prosecution's theory was that the petitioner sold drugs before his incarceration—in 2003 and early 2004—and that Vaughn and Chase were mistaken. (Tr. at 2260-63.)  In any event, the parties corrected the record, stipulating that "from February 14, 2004, through 2005, [the petitioner] did not make sales of narcotics."  (*Id.* at 2268.)  Because the Government corrected the inaccurate testimony, there was no violation of due process.

### iii.   *Hearsay and Confrontation Clause*

Lamar Chase and Dava Allen testified about statements that Earl Mangen, a Gorilla Blood, made about the drug selling conspiracy.  The petitioner argues that their testimony violated his right of confrontation under the Sixth Amendment.[10]  (ECF No. 198-1 at 5.)  The Confrontation Clause bars the admission of "testimonial" statements of a witness "who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination."  *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004).  Statements in furtherance of a conspiracy, however, "are non-testimonial for purposes of the Confrontation Clause, and are therefore not covered by its protections."  *United States v. Shyne*, 617 F.3d 103, 108 (2d Cir. 2010) (citing *Crawford*, 541 U.S. at 56 (noting that most hearsay exceptions "covered statements that by their nature were not testimonial—for example, business records or statements in furtherance of a conspiracy.")).  Mangen's out-of-court statements were admissible as statements in furtherance of a conspiracy under Rule 801(d)(2)(E).  Because these statements were non-testimonial, they were properly admitted.

---

[10] The petitioner concedes that the statements are admissible under the Federal Rules of Evidence.  (ECF No. 198-1 at 5.)

#### iv. *Prosecutorial Misconduct*

I also reject the petitioner's claim that one of the prosecutors had improper contact with a juror. (ECF No. 198-1 at 6.) During a recess in the trial, a prosecutor informed courtroom security officers in the court's lobby that there was a "fight out on the street that may be related to a trial in the courthouse." (Tr. at 1089.) After he spoke to the officers, the prosecutor noticed that juror six was also in the lobby, but did not think that the juror heard what he said. (*Id.*) Nevertheless, he reported the incident to the court and counsel, who agreed there was no need to take any further action. "Extremely brief and inconsequential" exchanges with a juror do not amount to juror misconduct. *See United States v. Stephenson*, 183 F.3d 110, 117 (2d Cir. 1999); *see also Lewis v. United States*, 20-CV-718, 2012 WL 2394810, at *4 (E.D.N.Y. June 25, 2012) (brief contact with a juror outside of the courtroom when the juror asked where the jury room was does not amount to juror misconduct).

#### v. *Unconstitutional Sentencing*

Finally, the petitioner maintains that Judge Townes sentenced him for violating New York State law. (ECF No. 198-1 at 6.) In fact, Judge Townes sentenced the petitioner for violations of federal RICO statutes—18 U.S.C. § 1962 (racketeering) and 18 U.S.C. § 1959 (violent crimes in aid of racketeering); those statutes criminalize violations of state law in specific circumstances. *See* 18 U.S.C. § 1961(1) (defining "racketeering activity" to mean "any act or threat involving murder, kidnapping, gambling, arson . . . which is chargeable under State law and punishable by imprisonment for more than one year"); *see also United States v. Bagaric*, 706 F.2d 42, 62 (2d Cir. 1983) ("Courts construing the racketeering statutes have found that the references to state law serve a definitional purpose, to identify generally the kind of activity made illegal by the federal statute.") (citations omitted). The petitioner was convicted and

sentenced not for violating New York's Penal Law, but for committing federal racketeering acts, the predicate offenses of which were violations of the New York Penal Law.

## CONCLUSION

The petition for writ of habeas corpus is denied in its entirety.  The case is dismissed.  A certificate of appealability will not be issued.  *See* 28 U.S.C. § 2253(c).

**SO ORDERED.**

s/Ann M. Donnelly
_____
Ann M. Donnelly
United States District Judge

Dated: Brooklyn, New York
       July 13, 2020